UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 20-62 |
| v. | * | SECTION: "R" |
| WARREN G. TREME | * | |
| | * * * | |

## FACTUAL BASIS

1. The Defendant, **WARREN G. TREME ("TREME")**, intends to plead guilty as charged to Count One of the Bill of Information pending against him, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.

2. The United States and **TREME** do hereby stipulate and agree that the allegations in the Bill of Information and the following facts are true and correct and that, should this matter have proceeded to trial, the Government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not attempt to set forth all of the facts known to the United States regarding the allegations in the Bill of Information. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **TREME's** guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting the Defendant's guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).

AUSA _SL_
Defendant _WM_
Defense Counsel _[signature]_

## I. AT ALL MATERIAL TIMES HEREIN

### A. FIRST NBC BANK

1. At all times material to the Bill of Information, First NBC Bank ("the Bank") was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

2. The Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, the Bank maintained branch offices in Louisiana, Mississippi, and Florida.

3. The Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Ashton J. Ryan, Jr. (referred to in the Bill of Information as "Bank President A," but "Ryan" herein) was a founder of the Bank and acted as its President and Chief Executive Officer from in or around May 2006, until in or around December 2016.

4. The Bank also had a Board of Directors ("the Board").

5. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

6. On or about April 28, 2017, the Bank was declared failed and was closed by the Louisiana Office of Financial Institutions ("LOFI"). Thereafter, the FDIC took control over the Bank. The Bank's failure cost the FDIC's deposit insurance fund approximately $996.9 million.

7. Ryan was a founder of the Bank and acted as its President, Chief Executive Officer, and Chairman of the Board from in or around May 2006 until in or around December 2016, when he stepped down as CEO and Chairman of the Board. Ryan was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's

AUSA _SL_
Defendant _AR_
Defense Counsel

day-to-day operations. Additionally, Ryan was responsible for keeping other Board members informed of the Bank's true financial condition, the adequacy of its policies and procedures, and its internal controls.

8. William J. Burnell (referred to in the Bill of Information as "Bank Officer B," but "Burnell" herein) was the Bank's Chief Credit Officer from in or around 2006 through April 2017. He was responsible for, among other things, the overall quality of the Bank's lending function; the Bank's credit policies and administration; the Bank's loan recovery and collection efforts; and the Bank's monitoring and managing of past due loans, including the approval of the Bank's internal list of past due loans. Burnell was responsible for compiling month-end reports, including lists of overdrawn borrowers and past-due loans. These reports should have accurately shown the quality of the Bank's assets, which included loans. Misrepresentations on these reports would have made a true assessment of the Bank's overall financial well-being impossible. Burnell was also responsible for assigning risk ratings before the Bank decided to lend to its customers. In the Bank's rating system, a "10" meant very low risk of loss to the Bank, while a "1" signified a high risk of loss to the Bank.

9. As a financial institution, the Bank was subject to regulatory supervision by the FDIC and LOFI, which were charged with supervising and regulating the Bank to ensure that it engaged in safe and sound banking practices and complied with federal and state banking laws.

10. The Bank was also required to undergo periodic safety and soundness examinations conducted by the FDIC and LOFI. The Bank was required to accurately report information regarding past due loans to the FDIC and LOFI regulators in advance of these examinations, which affected the regulators' conclusions regarding the Bank's financial condition.



AUSA
Defendant
Defense Counsel

11.     In addition, the Bank hired external auditors to evaluate the accuracy of the Bank's financial statements related to, among other things, the Bank's loan portfolio and investments.

**B.     TREME'S RELATIONSHIP WITH FIRST NBC BANK**

1.      The defendant, **WARREN G. TREME ("TREME")**, was a businessman and part owner of the following entities: BNW Ventures, Airline Investment Properties, Airline Investments II, Gulf Mississippi River Port, and Treme Builders. Together with Ryan, **TREME** also owned Wadsworth Estates, R Bend Estates Homes, R Bend Estates, and R Bend Estates II. **TREME** and certain of his entities were borrowers at the Bank.

2.      Prior to the founding of the Bank, **TREME** was a borrower at Bank B, where Ryan was President until he left to help found First NBC Bank. Despite the conflict of interest that resulted from **TREME's** business partnership with Ryan, Ryan exercised authority over **TREME's** loans at Bank B.

3.      From at least 2008 through in or around April 2017, **TREME** was a borrower at First NBC Bank. Because of **TREME** and Ryan's business relationship, another Bank employee served as the loan officer for **TREME's** loans at First NBC Bank, while Burnell served as the approving officer and assigned the credit risk rating to those loans. Although Ryan should not have been involved in **TREME's** borrowing relationship, he continued to exercise authority over **TREME's** loans by, among other things, approving overdraft payments and loan disbursements

4.      By the time the Bank closed, **TREME** and his entities owed the Bank approximately $6.3 million.

AUSA ___
Defendant ___
Defense Counsel ___



## II. THE BANK FRAUD CONSPIRACY

### A. THE CONSPIRACY:

Beginning at a time at a time unknown, but from at least 2008, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **WARREN G. TREME**, Ryan, Burnell, and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Section 1344.

### B. THE SCHEME AND ARTIFICE TO DEFRAUD:

1. It was part of the scheme and artifice to defraud that the defendant, **WARREN G. TREME**, Ryan, and Burnell unjustly enriched themselves by disguising the true financial status of **TREME** and his entities' loans, which in turn concealed the true financial condition of **TREME** and his entities from the Board, auditors, and examiners.

2. It was further part of the scheme and artifice to defraud that **TREME**, Ryan, and Burnell concealed the true financial condition of **TREME** and his entities' loans in many ways, including (1) overdrawing demand deposit accounts to make loan payments; (2) using Bank loan proceeds to make loan payments; (3) and increasing, extending, or renewing existing loans, and issuing new loans, to hide **TREME's** inability to make loan payments. These actions benefitted

AUSA SL
Defendant WA
Defense Counsel

**TREME** by, among other things, preventing **TREME** from being forced into default and the Bank from declaring a loss.

3. It was further a part of the scheme and artifice to defraud that **TREME**, Ryan, and Burnell knowingly and intentionally diverted loan proceeds from **TREME's** loans to benefit Wadsworth Estates, a real estate project jointly owned by **TREME** and Ryan.

4. It was further part of the scheme and artifice to defraud that **TREME**, Ryan, and Burnell, knowingly and intentionally concealed Ryan's participation in and oversight of **TREME's** loans, which benefited Ryan, from the Board, auditors, and examiners.

5. In numerous loan documents over several years, **TREME** made misrepresentations and material omissions related to his financial status and the purpose of his loans. Ryan and Burnell were aware of these misrepresentations and material omissions. Rather than writing off **TREME's** loans or otherwise discouraging **TREME** from lying in loan documents, Ryan and Burnell approved and facilitated **TREME's** loans knowing they contained these misrepresentations and material omissions. They also made misrepresentations and material omissions of their own regarding **TREME's** loans.

6. For example, in June 2014, **TREME** signed loan documents stating that he intended to use loan proceeds on working capital for long term investments. In reality, these loan proceeds were used to pay previous **TREME** loans and an overdraft in **TREME's** deposit account, as well as some of his personal expenses, including restaurants, bars, and golf fees. **TREME** lacked sufficient income and cash flow from his businesses to pay his own loans and personal expenses. As a result, **TREME** relied on the Bank loans to fund his debt service and lifestyle. Ryan and Burnell were aware of **TREME's** true financial status. Nevertheless, Ryan and Burnell

6

AUSA _SL_
Defendant _MA_
Defense Counsel _____

approved and facilitated the June 2014 loan by, among other things, falsely stating that the loan contained normal risks, falsely stating that **TREME** would repay the loan using income from his businesses, and falsely omitting the material fact that **TREME** lacked sufficient income to make his own loan payments unless he received additional loans.

7.     In February 2016, **TREME** signed loan documents stating that he intended to use loan proceeds to cover business expenses. Rather than using the proceeds for their stated purpose, **TREME** spent the money on renovations to his personal residence, gambling, and $74,000 in payments related to Wadsworth Estates, the business **TREME** co-owned with Ryan. Ryan and Burnell approved and facilitated the February 2016 loan by, among other things, stating that **TREME** would repay the loan with income from his businesses and falsely omitting the material fact that **TREME** lacked sufficient income to make his own loan payments unless he received additional loans.

8.     In these and other loans, **TREME** worked with Ryan and Burnell to funnel money to himself and to his entities, including Wadsworth Estates, the business **TREME** co-owned with Ryan. To accomplish this, Ryan and Burnell lied to and concealed material information related to **TREME's** loans from the Board, auditors, and examiners.

9.     Additionally, in late 2015 and early 2016, **TREME**, Ryan, and Burnell negotiated a settlement with two of **TREME's** other business partners. As part of the settlement, **TREME's** business partners agreed to pay the Bank $400,000. Rather than using the $400,000 to pay down the outstanding debt owed by **TREME** and his business partners, Ryan and Burnell gave $300,000

AUSA _SL_
Defendant _MT_
Defense Counsel

to **TREME**. **TREME** spent the money on gambling, a trip to the Caribbean, and approximately $14,000 in expenses related to Wadsworth Estates. During a subsequent Board meeting, Ryan and Burnell falsely stated that the $300,000 was used to pay down the outstanding debt by **TREME** and his business partners.

10. All in violation of Title 18, United States Code, Section 1349.

### III. CONCLUSION

Various records, including income tax returns, IRS filing records, bank records, corporate records, audio and video recordings, and documents and tangible objects would be introduced at trial to prove the facts as set forth above. In addition, the testimony of employees and agents of the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation Office of Inspector General, the Federal Reserve Board of Governors Office of Inspector General, and other competent witnesses would be introduced at trial to prove the facts set forth above.

**APPROVED AND AGREED TO:**

_____
SHARAN E. LIEBERMAN
J. RYAN McLAREN
MATTHEW R. PAYNE
NICHOLAS D. MOSES
Assistant United States Attorneys

8-26-20
Date

_____
FRANK DESALVO
Attorneys for Warren G. Treme

8/31/20
Date

_____
WARREN G. TREME
Defendant

8/31/20
Date

8